UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

LEWIS IANNI,

                                    Plaintiff,

                    v.

JoANNE B. BARNHART, Commissioner
 of the Social Security Administration,

                                    Defendant.

_____

**REPORT**
**and**
**RECOMMENDATION**

**02-CV-074A(F)**

APPEARANCES:          TOOHEY CLARY & BAX, LLP
                      Attorneys for Plaintiff
                      DENNIS A. CLARY, of Counsel
                      904 Center Street
                      PO Box 732
                      Lewiston, New York 14092-0732

                      KATHLEEN M. MEHLTRETTER
                      Acting United States Attorney
                      Attorney for Defendant
                      CHRISTOPHER V. TAFFE
                      Assistant United States Attorney, of Counsel
                      100 State Street
                      Room 620
                      Rochester, New York 14614


<u>**JURISDICTION**</u>

        This case was referred to the undersigned by Honorable Richard J. Arcara on

June 13, 2002 for preparation of a Report and Recommendation on the merits of this

action.  The matter is presently before the court on Defendant's motion for judgment on

the pleadings (Doc. No. 14), filed October 9, 2002.

## BACKGROUND

Plaintiff Lewis F. Ianni seeks review of the Commissioner's decision denying him Social Security Disability Insurance Benefits ("SSDI") under Title II of the Social Security Act ("the Act").  In denying Plaintiff's application for benefits, the Commissioner determined that although Plaintiff has not, since the alleged onset of his disability on February 25, 1986, engaged in substantial gainful activity and suffers from cerebral palsy, Plaintiff does not have an impairment or combination of impairments within the Act's definition of impairment.  (R. 18-19).[1]  The Commissioner determined that Plaintiff's allegations about his impairment are not fully credible.  (R. 19).  The Commissioner also found that although Plaintiff was unable to perform any past relevant work, Plaintiff had the residual functional capacity for the full range of sedentary work.  (R. 19).  As such, Plaintiff was found not disabled, as defined in the Act, at any time through December 31, 1991, the last date Plaintiff met the disability insured status requirements, or through the date of the Commissioner's decision. (R. 18-20).

## PROCEDURAL HISTORY

Plaintiff filed an application for SSDI benefits with a protective filing date of February 12, 1999, alleging he was disabled since February 12, 1986.  (R. 92-94).  The application was initially denied on April 12, 1999 (R. 56, 58-61), and upon reconsideration on September 2, 1999.  (R. 57, 70-72).  Pursuant to Plaintiff's request

---

[1] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

2

(R. 73-74), on May 23, 2000, an administrative hearing was held before Administrative Law Judge ("ALJ") Timothy M. McGuan ("the ALJ"), at which time Plaintiff, represented by Dennis A. Clary, Esq., appeared and testified.  (R. 23-55).  On June 26, 2000, the ALJ found Plaintiff was not disabled.  (R. 10-20).

On June 26, 2000, Plaintiff requested review of the hearing decision by the Appeals Council.  (R. 6-9).  Upon considering Plaintiff's request for review of the ALJ's hearing decision and the record, the Appeals Council, on December 20, 2001, found no basis for granting the review and denied the request, thereby rendering the ALJ's hearing decision the final decision of the Commissioner.  (R. 4-5).  This action followed on January 25, 2002.

The Commissioner's answer to the Complaint, filed on June 10, 2002 (Doc. No. 10), was accompanied by the attached record of the administrative proceedings.  On October 9, 2002, the Commissioner filed a motion for judgment on the pleadings, supported by the attached Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 14) ("Commissioner's Memorandum"), and the Affidavit of Assistant United States Attorney Christopher V. Taffe ("Taffe Affidavit").  On January 16, 2003, Plaintiff filed a Memorandum of Law in opposition to the Commissioner's motion (Doc. No. 17) ("Plaintiff's Response").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for judgment on the pleadings (Doc. No. 14) should be DENIED, and the matter should be remanded for calculation of benefits or, alternatively, for further development of the record.

3

<u>**FACTS**</u>[2]

**Evidence Relevant to Period Prior to Plaintiff's Date Last Insured**

Plaintiff, Lewis F. Ianni, who was born on February 25, 1959,  two months premature and with cerebral palsy, has lived his entire life with his parents.  (R. 34, 102).  Plaintiff has a college degree and worked as a telephone sales representative from 1982 through 1986.  (R. 37, 100, 116, 118).  Plaintiff last worked on February 25, 1986, when a decrease in the dexterity in his arms and legs rendered Plaintiff unable to meet his sales quota of 25 telephone sales calls per day.  (R. 38, 47, 99).  According to Plaintiff, his employer agreed to treat the situation as a layoff, rather than discharging Plaintiff to avoid embarrassing Plaintiff.  (R. 38).

Although it is undisputed that Plaintiff was born with cerebral palsy, the medical evidence pertaining to the time period relevant to Plaintiff's claim, *i.e.*, prior to December 31, 1991, the date Plaintiff was last insured for purposes of SSDI, is sparse. Since 1973, Plaintiff's treating physician has been an affiliate of Niagara Family Medicine Associates, P.C. ("NFMA").  (R. 153, 224, 242).  Specifically, from 1973 until his death in 1995, NFMA affiliate Robert Brennen, M.D. ("Dr. Brennen") treated Plaintiff; from 1995 until his retirement in September 1999, NFMA affiliate James Moore, M.D. ("Dr. Moore"), treated Plaintiff; and NFMA affiliate Philip Sauvageau, M.D. ("Dr. Sauvageau"), has treated Plaintiff since September 1999.  (R. 153, 224, 242).

Plaintiff's medical records show that Dr. Brennen treated Plaintiff on November 28, 1983, February 18, 1985, May 29, 1985 and September 18, 1985 for a variety of

---

[2] Taken from the pleadings and motion papers filed in this action.

symptoms and ailments, including high blood pressure, tension headaches, diarrhea and upper respiratory infections.  (R. 270).  On November 28, 1983, Plaintiff weighed 165 pounds. (R. 270).  Medications taken by Plaintiff included Tavist (sinus medication), Tenorim (high blood pressure) Excedrine and Amoxicillin (antibiotic).  (R. 270).

On October 24, 1987, Dr. Brennen completed a vocational rehabilitation report with regard to Plaintiff.  (R. 259-60).  According to Dr. Brennen, Plaintiff had been diagnosed with cerebral palsy, which was a permanent, yet stable condition, and which could neither be removed nor substantially reduced by treatment.  (R. 260).  Dr. Brennen described the effect of the cerebral palsy on Plaintiff's nervous system as "spasticity of legs - walks [with] bent, spastic legs, slowly and with great effort," and "marked lumbar lordosis."  (R. 260).  Plaintiff's physical activities, including walking, standing, stooping, kneeling, lifting, reaching, pushing and pulling were limited.  (R. 260).  Dr. Brennen further remarked that Plaintiff "is intelligent - well motivated and vocational rehab for some sedentary occupation would be very beneficial."  (R. 260).

Dr. Brennen's treatment notes from June 10, 1988, indicated Plaintiff's sinuses were "bad" and his headaches persisted.  (R. 180).  Plaintiff was prescribed Vasotec and Corgard for high blood pressure, and Beclonase (antihistamine) for his sinuses. (R. 180).  Dr. Brennen also noted he would refer Plaintiff to "Megahed."  (R. 180).

Dr. Brennen further examined Plaintiff twice between June 10, 1988 and November 29, 1988.[3]  (R. 180).  On the first of the two examinations, Dr. Brennen changed Plaintiff's high blood pressure medication to Isoptin, and prescribed Fioricet for

---

[3] The precise dates of these examinations is obscured in the record.  (R. 180).

Plaintiff's tension headaches.  (R. 180).  On the second visit, Plaintiff reported less headaches and his prescribed medications were continued.  (R. 180).

On August 1, 1988, Plaintiff was evaluated by neurologist M.S. Megahed, M.D. ("Dr. Megahed").  (R. 187).  In his report to Dr. Brennen, Dr. Megahed wrote "[a]s soon as he came into the office I could tell that he [Plaintiff] has cerebral diplegia."[4]  (R. 187). Dr. Megahed's neurological examination of Plaintiff revealed no trouble with Plaintiff's head, neck, upper or lower limbs, "except for the gait and the spastic muscles of the lower limbs," and Plaintiff's deep and superficial sensations were intact.  (R. 187).  Dr. Megahed's impression was cerebral diplegia.  (R. 187).  Dr. Megahed also noted he observed "an involuntary movement of both eyelids and nose," which could be attributed to either a nervous tic or a small petit mal seizure from birth.  (R. 187).  Dr. Megahed planned to order a computed tomographic scan ("CT scan") and and electoencephalogram ("EEG"), stating that "[i]f both are negative then he can do whatever he wants."  (R. 187).

On August 15, 1988, the CT scan and the EEG were performed on Plaintiff at Mount St. Mary's Hospital of Niagara Falls, in Lewiston, New York.  (R. 185 (EEG), and 186 (CT scan)).  The purpose of the EEG was to determine the cause of Plaintiff's involuntary facial twitching observed by Dr. Megahed on August 1, 1988 (R. 185; *see* R. 187).  The EEG failed to show any "clear and precise evidence . . . in the sleep and waking record for any definite focal or diffuse abnormality," and "[n]o epileptiform

---

[4] "Cerebral palsy may be classified by the type of movement problem (such as spastic or athetoid cerebral palsy) or by the body parts involved (Hemiplegia, diplegia, and quadriplegia)," and "cerebral diplegia" primarily involves the lower extremities. CEREBRAL PALSY: A GUIDE FOR CARE, *available at* http://gait.aidi.udel.edu.res695/homepage/pd_ortho/clinics/c_palsy/cpweb.htm.

discharges [neuron discharges or brain waves indicative of an epileptic disorder] were seen." (R. 185) (bracketed text added). The provisional diagnosis following the EEG was to rule out that a petit mal seizure caused the twitching. (R. 185). The CT scan of Plaintiff's head was negative. (R. 186).

On November 11, 1988, Plaintiff was admitted to Niagara Falls Memorial Medical Center in Niagara Falls, New York, with complaints of an inability to swallow food. (R. 181). In particular, Plaintiff, while eating some turkey, swallowed the food, "but then the food that he swallowed was unable to pass down from the esophagus." (R. 181). Plaintiff, who did not report any respiration difficulties, began to salivate, but could not vomit to get rid of the food and had pain in his esophagus. (R. 181). The food passed overnight and Plaintiff was released the following day with instructions to chew his food well and to eat slowing. (R. 181). The Discharge Summary notes that Plaintiff was taking Calan (high blood pressure medication), and was to be examined by Dr. Brennen in two to three weeks. (R. 181). The results of a roentgenographic (X-ray photographic) examination performed on Plaintiff at Niagara Falls Memorial Medical Center on November 27, 1988 was negative. (R. 182).

On November 29, 1988, Dr. Brennen examined Plaintiff and noted Plaintiff's recent hospitalization for a foreign body in Plaintiff's esophagus. (R. 180). Plaintiff's medications included both Isoptin and Lozol for high blood pressure and Plaintiff also took Tylenol. (R. 180).

Dr. Brennen treated Plaintiff on January 20, April 7, April 28, and August 4, 1989, and on February 7, 1990, for various symptoms and ailments, including high blood pressure, constipation, a stiff neck, headaches and diarrhea. (R. 179). Plaintiff

reported Fibercon helped relieve his constipation.   Pericolace (stool softener) was recommended.  (R. 179).  Plaintiff's blood pressure medication was changed from Isoptin to Hytrin.  (R. 179).  Plaintiff's other medications included the antihistamines Seldane and Hismanol.  (R. 179).  On February 7, 1990, Dr. Brennen queried why Plaintiff was losing weight, noting Plaintiff then weighed 141 ½ pounds.  (R. 179).

Dr. Brennen treated Plaintiff on July 18, September 20 and November 19, 1990, and March 8, August 16, and December 16, 1991 for a variety of symptoms and ailments, including high blood pressure, congested sinus cavities, sore throat, upper respiratory infection, headaches and constipation.  (R. 268-69).  On March 8, 1991, Dr. Brennen noted that Plaintiff was worried about his health and was not eating (R. 269), and Plaintiff's weight decreased from 165 pounds on November 28, 1983, to 131 ½ pounds on December 16, 1991.  (R. 268).  Plaintiff's medications during this period included Lozol (high blood pressure), Centrum (nutrition supplement), Hismanol (anti-histamine), saline gargle, Tylenol and Hytrin (high blood pressure).  (R. 268-69).

An X-ray of Plaintiff's chest taken July 9, 1991 was normal.  (R. 178).  There record contains no other evidence for the period ending December 31, 1991, the date the Plaintiff last met the disability insured status requirements.

On a Disability Report: Adult form completed by Plaintiff on March 4, 1999 in connection with Plaintiff's disability benefits application, Plaintiff reported he was 5' 10" tall, weighed 163 pounds, and was claiming he was unable to work based on cerebral palsy, high blood pressure, "sinus trouble," spasms of the esophagus, and a small non-cancerous brain tumor in the left anterior portion of his head.  (R. 98-107).  According to Plaintiff, his cerebral palsy resulted in spastic leg muscles, limited balance coordination,

and motor skills including hands and fingers, and sway back.  (R. 99).  Plaintiff

explained he was unable to stand on his feet without pain or loss of balance, to sit for

periods of time without pain or loss of balance upon rising, had frequent headaches,

and limited coordination resulting in decreased speed and accuracy with regard to

manual tasks.  (R. 99).  Plaintiff reported he had cerebral palsy since his birth on

February 25, 1959, first became unable to work because of his cerebral palsy on

February 25, 1986, and that his condition was deteriorating.  (R. 99, 106).

Plaintiff reported that he worked from June 1981 until March 1986, he was

unable to find employment after his last job because of limited mobility, lack of dexterity,

lack of coordination and general skeletal-muscular pain attributed to his cerebral palsy.

(R. 99).  According to Plaintiff, he was laid off from his most recent job.  (R. 99).

Plaintiff described his most recent job as a telephone sales representative as using a

computer to verify credit information, and requiring him to use machines, tools and

equipment, write and complete reports or perform similar tasks, and sit, write, type or

handle small objects for 8 ½ hours a day.  (R. 100, 106).  According to Plaintiff, his

telephone sales representative job required no lifting or carrying, and that the heaviest

weight lifted or carried on the job was less than 10 pounds.  (R. 100).  Plaintiff also

reported that he was born two months premature, and spent the first six weeks of his

life in an incubator.  (R. 102).

Between 1961 and 1963, Plaintiff underwent three corrective surgical

procedures, performed at Children's Hospital in Buffalo, New York, on his ankles, knees

and hips to improve his ability to walk on his own, he received physical therapy to learn

how to walk and wore a brace on his feet at night.  (R. 103).  Plaintiff's medications

included Hytrin for high blood pressure, Claritin for sinus problems, Paxil for depression, Depakote for reduction of muscle pain and possible headache relief, Axid to control indigestion and possible esophageal spasms, and Nitrostat and Nuerintin to control esophageal spasms.  (R.104, 106).  The only side effect Plaintiff had with any of his medications was "occasional drowsiness" with the Depakote.  (R. 104).

On a Daily Activities Questionnaire Plaintiff completed on March 19, 1999 in connection with his disability benefits application, Plaintiff stated he experience pain attributed to cerebral palsy since birth, but that its intensity significantly increased in "early 1986" and has since become even more intense.  (R. 113).  Plaintiff explained he had daily, constant pain, which he described as "ranging from dull at times to an ache, pinching, burning sensation, or stabbing pain as physical activity increases," in his head, shoulders, fingers, lower back, legs and feet.  (R. 113, 114).  According to Plaintiff, his pain was increasing with age, and his headaches, muscle aches, back pain, leg and foot pain can become unbearable without medication, causing loss of balance, and inability to walk, requiring bed rest in the most extreme case, and that finger pain increased with use of his hands.  (R. 113).  Plaintiff's pain was relieved with Depakote, which caused occasional drowsiness.  (R. 113).

Plaintiff described his activities of daily living as including shopping whenever possible, household chores when necessary unless the chores caused too much pain, and explained that he lived with his parents who did most of the grocery shopping and household chores, drove Plaintiff to appointments and other activities, and that he socialized with friends "when I [Plaintiff] feel up to it."  (R. 114).  According to Plaintiff, increased activity caused increased pain which caused him to stop the activity.  (R.

115).

In a vocational report Plaintiff completed on March 19, 1999 in connection with his disability benefits application, Plaintiff listed his two past jobs, including the sales representative position with a securities firm Plaintiff held from June 1981 to April 1982, and the telephone sales representative position with a business forms company Plaintiff held from April 1982 until March 1986.  (R. 116).  Plaintiff described the basic job duties of the securities sales representative job as requiring him to make appointments with clients by telephone, use a calculator, write up a client's securities purchase, see clients in their homes or places of business by taking taxicabs during the day and having his father drive him to evening appointments, and using a carpool or public transportation to attend general sales meetings at his employer's office.  (R. 117).  The physical demands of the job required Plaintiff to sit four hours a day, and carry a briefcase to appointments, and the heaviest weight lifted and carried was 10 pounds.  (R. 117). Plaintiff described the basic job duties of the business forms telephone sales representative position as requiring him to place telephone calls to clients, documenting calls, preparing paperwork for orders placed, using a calculator to price orders, using a computer to verify clients' credit information, and using a carpool and public transportation to travel to his office.  (R. 118).  The physical demands of the job required Plaintiff to sit for eight hours a day, lift file folders, calculator and telephone, and carry a briefcase between his home and office, and the heaviest weight lifted and carried was 10 pounds.  (R. 118).

Plaintiff explained that since leaving his telephone sales representative position with the business forms company in 1986, his attempts to find alternative work have

been unsuccessful because of his lack of mobility, dexterity and coordination.  (R. 121).

Plaintiff maintains he has been unable to meet the physical requirements of the jobs for

which he applied because of limited coordination of his fingers, and decreased speed

and accuracy of basic manual tasks.  (R. 121).

According to Plaintiff, he is able to tend to his personal needs, although his

limited mobility increases the time it takes him to perform tasks.  (R. 124).  Plaintiff's

parents provided Plaintiff with transportation.  (R. 124).  Plaintiff states that because of

a decreased sense of balance, he no longer takes showers, and it is difficult for him to

get into and out of the bathtub.  (R. 124).  The severity of Plaintiff's pain has increased

and is constant, and he falls more frequently.  (R. 124).  Also increased in Plaintiff's

need for pain medication and bedrest for pain and headaches.  (R. 124).  Plaintiff is no

longer able to assist with mowing the lawn or shoveling snow.  (R. 124)

On an undated Physical Residual Functional Capacity Assessment completed by

Jon S. Miller, M.D. ("Dr. Miller"), on a consultative basis in connection with Plaintiff's

disability benefits application, (R. 161-68), Dr. Miller reported Plaintiff's primary

diagnosis was cerebral palsy and his secondary diagnosis was hypertension.  (R. 161).

With regard to assessing Plaintiff's exertional limitations, however, Dr. Miller checked

the box indicating "None established" and stated that there was insufficient medical

evidence to support finding Plaintiff had any medically determinable impairment.  (R.

162).  On another Physical Residual Functional Capacity Assessment completed on

September 2,1999, by a Dr. Micale (R. 194-201), Plaintiff's primary diagnosis was

stated as cerebral palsy, no secondary diagnosis was indicated and the box indicating

Plaintiff had not established any exertional limitations was again checked.  (R. 194-95).

12

According to Dr. Micale, although Plaintiff's medical records relevant to the period of time prior to Plaintiff's date last insured show Plaintiff has been diagnosed with cerebral palsy, there is insufficient evidence in the record to make a medical determination.  (R. 195).

At the ALJ hearing held on May 23, 2000, Plaintiff, represented by his attorney, Dennis A. Clary, Esq., appeared and testified in support of his disability benefits application.  (R. 23-55).  Plaintiff testified that he graduated in 1981 from Niagara University with a Bachelor of Science degree in Commerce with a Management concentration.  (R. 33).  Plaintiff, who lived with his parents in a house in Niagara Falls, New York, had no income from any source.  (R. 33-34).  As of the date of the hearing, Plaintiff's medications included Hytrin for hypertension, Claritin for sinuses, Paxil and Depakote for pain, which had recently been changed to Neurontin, Axid for indigestion and esophageal spasm, the diuretic Hydrochlorothiazide, and Aspirin-Free Excedrin for headaches.  (R. 34-35).

With regard to past relevant work, Plaintiff testified that after graduating college, he first worked as an outside sales representative for a mutual fund company, but his lack of mobility required him to schedule appointments only in the evening when his father was able to drive him to and from the appointments.  (R. 35-36).  Plaintiff obtained a driver's license in 1987 after undergoing testing that showed his reflexes were good enough to allow him to drive.  (R. 36).  Plaintiff's next job was a telemarketing sales representative position in which Plaintiff sold business forms over the telephone.  (R. 36).  Plaintiff explained this was an "inside sales rep" position, in which Plaintiff, from inside the employer's place of business, placed telephone calls to

potential clients, rather than a direct outside sales force position in which the sales

representative would physically visit the potential client's place of business.  (R. 37).

According to Plaintiff, although he was technically "laid off" from his inside sales

rep position, in actuality, the dexterity in his arms and hands had decreased to where

he was no longer physically able to successfully perform the job and was not meeting

his specified telephone call count of 25 calls of the sales quota.  (R. 37-38).  Rather,

Plaintiff made only 15 to 18 calls a day.  (R. 47).  Plaintiff explained that he was placed

on probation for nonperformance during the summer of 1985 and again, shortly before

he left in early 1986.  (R. 38).  Plaintiff described the problems with his decreasing

dexterity interfered with his ability to pick up the telephone receiver to place calls, dial

the telephone, use a calculator for paperwork, pull files and reach above his head for a

pricing catalog.  (R. 38-39).  Plaintiff maintained he attempted to look for other work, but

that he was restricted by his lack of mobility and all the available positions for which he

applied, including banks, a local paper, and a company named Teletech, required that

he type at a minimum rate of 25 words per minute, which Plaintiff could not meet.  (R.

39-41).  According to Plaintiff, he applied monthly at Teletech, but each time he failed

the typing test, despite memorizing and practicing the paragraph required for the typing

test.  (R. 40-41).  Plaintiff explained that because of his cerebral palsy, he has never

had normal dexterity in his hands, and that at best, he could type using the "hunt and

peck method."  (R. 41).

Plaintiff described other effects as a result of his cerebral palsy, including neck

spurs that cause pain in his arms and numbness in his hands, esophageal spasms,

scoliosis (curvature of the spine), spastic leg muscles, his right heel cord is shorter than

his left, creating a jarring effect when he walks and, with prolonged walking in excess of

half an hour, the pain would travel from his feet to his head.  (R. 41-42).  Plaintiff

clarified that although his cerebral palsy has not been conclusively determined as the

cause of his esophageal spasms, neither has it been ruled out as the cause.  (R. 42).

According to Plaintiff, the esophageal spasms caused mucus to build up between his

esophagus and his stomach, requiring Plaintiff to undergo an esophagus-widening

procedure every couple of years to break up the mucus.  (R. 42).  In response to the

ALJ's questioning, Plaintiff testified that he can walk without assistive devices, but that

walking was becoming increasingly more difficult.  (R. 43).  Plaintiff estimated he could

stand for 15 minutes but with severe lower back pain which was relieved by lying down,

that he could sit for half an hour to an hour, but would then tend to fall backward upon

standing because his knees would not support him and he would "stiffen up" while

sitting.  (R. 43-44).  Plaintiff tended to alternate between sitting and standing.  (R. 44).

Plaintiff estimated he could not lift more than ten pounds without losing his balance.  (R.

44).

       In response to questioning by his attorney, Plaintiff stated that he gets daily

headaches caused by his sinus trouble and the angle at which his esophagus condition

requires him to sleep, usually wakes up with a headache, for which he takes Neurontin

and Aspirin-Free Excedrin, that he could not take aspirin because of his esophagus

condition, and that he could not function in the morning until his headache resolved.

(R. 44-45).  Plaintiff explained that although he usually had headaches only in the

morning, he had body pain throughout the day.  (R. 45-46).  Plaintiff experienced pain

and numbness in his arms and hands, caused by neck spurs, three or four times a

week.  (R. 45-46).

Plaintiff testified that his blood pressure medication causes slight fatigue, and that Neurontin causes dizziness, especially when taken in the afternoon.  (R. 46). Plaintiff estimated drowsiness from his medications required him to nap for one to three hours, three to four times a week.  (R. 46).  Plaintiff further explained that if his morning headache was not resolved by his medications, he would have to sleep it off.  (R. 47).

Vocational Expert Julie Andrews ("Andrews") testified that Plaintiff's past relevant work as a Telephone Solicitor was classified in the Dictionary of Occupational Titles ("DOT"), as semiskilled and sedentary.  (R. 49).  The ALJ asked Andrews whether a hypothetical in which a person of the same age, education and work experience as Plaintiff, with the ability to stand and/or walk up to two hours, sit for up to six hours, with the opportunity to change position at will, lift up to ten pounds, push or pull twenty-five pounds frequently with the upper extremities and occasionally with the lower extremities, perform occasional handling, reaching, fingering, or feeling, but could never climb, balance, kneel, crouch or crawl and was to avoid concentrated exposures to height, noise, vibration, humidity and machinery, could perform the Telephone Solicitor position, and Andrews responded in the negative.  (R. 49-51).  At the ALJ's request, Andrews identified Surveillance System Monitor as one position which such a hypothetical person, explaining such position was listed in the DOT as unskilled and sedentary.  (R. 51).  According to Andrews, 191,000 such positions existed in the national economy, with 1250 existing in the Western region of New York, which includes Erie, Niagara, Chautauqua, Cattaraugus and Allegany counties.  (R. 51-52). When asked by Plaintiff's attorney to modify the ALJ's hypothetical to include that the

hypothetical person took medication, the side effects of which included drowsiness requiring the person to sleep for an hour during the day, two or three times a week, Andrews responded the hypothetical person could not perform any position within the DOT.[5]

**Evidence Relevant to Period After Plaintiff's Date Last Insured**

The record establishes that after December 31, 1991, Plaintiff continued to have esophageal and other physical problems.  In particular, according to medical records submitted by Raymond J. Tuoti, M.D., F.A.C.G. ("Dr. Tuoti"), on November 21, 1995, Plaintiff began to exhibit symptoms of an esophageal spasm.  (R. 250).  On December 8, 1995, Plaintiff underwent a penendoscopy/esophageal dilation performed by Dr. Tuoti at Niagara Falls Memorial Medical Center.  (R. 143-44).  Pre-op diagnosis was dysphagia (difficulty swallowing).  (R. 143).  The procedure revealed a Schatzki's ring[6] above a small hiatal hernia without significant inflammation.  (R. 253).  The Schatzki's ring was dilated with a # 54 French balloon and Plaintiff was started on Axid (acid reflux medication) twice a day.  (R. 253).   The procedure was repeated on April1, 1998.  (R. 141-42).

---

[5] Plaintiff's attorney also modified the ALJ's hypothetical posed to Andrews to eliminate the drowsiness side effect of medication, requiring the person to nap for an hour several times a week, but adding a restriction in which the person's arms and hands go numb for an hour three to four times a week. (R. 53).  Andrews' response to the hypothetical, however, is not in the record as page 54 is missing from the Administrative Record.

[6] "Schatzki's ring" is an abnormal lower esophageal ring of tissue located at the junction of the esophagus and the stomach causing swallowing problems.  MEDLINE PLUS: MEDICAL ENCYCLOPEDIA, *available at*: http://www.nlm.nih.gov/medlineplus/ency/article/ooo208.htm.

On November 3, 1998, Plaintiff was examined, upon Dr. Moore's referral, by neurologist Günseli Sarpel, M.D. ("Dr. Sarpel").  (R. 150).  At that time, Plaintiff complained of balance problems and spasms in his legs and feet and reported his symptomatology was worsening.  (R. 150).  Dr. Sarpel found Plaintiff had cerebral palsy, with spastic paraparesis (paralysis usually involving groups of muscles), which was increasing as to weakness and cramping.  (R. 150).  Because Plaintiff also has scoliosis, Dr. Sarpel ordered a CT scan of the lower back to see if Plaintiff might also have spinal stenosis (a narrowing of the spinal canal, placing pressure on the nerves of the spine).

On January 25, 1999, Plaintiff underwent an electrodiagnostic study performed by Dr. Sarpel.  (R. 147-48).  The electrodiagnostic study was "basically within normal limits."  (R. 147).  Following the electordiagnostic study, Dr. Sarpel reported to Dr. Moore on January 25, 1999 theat an MRI of Plaintiff's brain did not reveal any abnormality intra-axially, but did show a small meningioma (benign brain tumor) in the left anterior fossa.  (R. 145).  Dr. Sarpel prescribed Depakote, which is used to treat epilepsy and migraine headaches in addition to bipolar disorders.  (R. 145).

Since filing for SSDI benefits, plaintiff subsequently, on February 7, 2001, filed for SSI benefits and the application was approved following an administrative hearing, based on a finding the Plaintiff's condition met the requirements for cerebral palsy as established by the Listing of Impairments.  Plaintiff's Response at 3 n. 2.

## DISCUSSION

### Disability Determination Under the Social Security Act

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> . . . to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & 423(d)(2)(A), and 1382c(a)(3)(A) & 1382c(a)(3)(C)(i).

Once the claimant proves that he is severely impaired and is unable to perform any

past relevant work, the burden shifts to the Commissioner to prove that there is

alternative employment in the national economy suitable to the claimant.  *Parker v.*

*Harris*, 626 F.2d 225, 231 (2d Cir. 1980).  "In assessing disability, the [Commissioner]

must make a thorough inquiry into the claimant's condition and must be mindful that

'the Social Security Act is a remedial statute, to be broadly construed and liberally

applied.'"  *Monguer v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (quoting *Gold v.*

*Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).


### A.    Standard and Scope of Judicial Review

The standard of review for courts reviewing administrative findings regarding

disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law

judge's findings are supported by substantial evidence.  *Richardson v. Perales*, 402

U.S. 389, 401 (1971).  Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight.[7]  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3).  "Congress has instructed . . . that the factual findings of the Secretary,[8] if supported by substantial evidence, shall be conclusive." *Rutherford v.*

---

[7] The treating physician's opinion is given greater weight because of the "continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

[8] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.  In accordance with § 106(d) of that Act, the Commissioner of Social Security has been substituted for the Secretary of Health and Human Services as the defendant in this action.

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step analysis that the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520, 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits.  *Id.*  The next step is to determine whether the applicant has a severe impairment which significantly limits his physical or mental ability to do basic work activities, as defined in the regulations.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Absent an impairment, the applicant is not eligible for disability benefits.  *Id.*  Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d), 416.920(d), as, in such a case, there is a presumption that an applicant with such an impairment is unable to perform substantial gainful activity.[9]  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920.  *See also Cosme v. Bowen*, 1986 WL 12118, at *2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional

---

[9] The applicant must meet the duration requirement which mandates that the impairment must last for at least a twelve month period.  20 C.F.R. §§ 404.1509 and 416.909.

capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If

the applicant can still perform work she has done in the past, the applicant will be

denied disability benefits.  *Id.*  Finally, if the applicant is unable to perform any past

work, the Commissioner will consider the individual's "residual functional capacity," age,

education and past work experience in order to determine whether the applicant can

perform any alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also*

*Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed,

claimant must show that he is without "the residual functional capacity to perform [his]

past work").  If the Commissioner finds that the applicant cannot perform any other

work, the applicant is considered disabled and eligible for disability benefits.  *Id.*  The

applicant bears the burden of proof as to the first four steps, while the Commissioner

bears the burden of proof on the final step relating to other employment.  *Berry, supra*,

at 467.  In reviewing the administrative finding, the court must follow this five-step

analysis to determine if there was substantial evidence on which the Commissioner

based her decision.  *Richardson v. Perales*, 402 U.S. 389 (1971).


**B.**     **Substantial Gainful Activity**

The first inquiry is to determine whether the applicant is engaged in substantial

gainful activity.  "Substantial gainful activity" is defined as "work that involves doing

significant and productive physical or mental duties and is done for pay or profit."  20

C.F.R. §§  404.1510 and 416.910.

In this case, the ALJ concluded that Plaintiff had not engaged in substantial

gainful activity since 1986,[10] the alleged onset date of his disability.  (R. 13, 19).  That

finding is undisputed.


**C.**   **Severe Physical or Mental Impairment**

The next step of the analysis is to determine whether the applicant had a severe

physical or mental impairment significantly limiting his ability to do "basic work

activities."  "Basic work activities" are defined as "the abilities and aptitudes necessary

to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work activities" include

walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing,

hearing, speaking, understanding, carrying out, remembering simple instructions, use of

judgment, responding appropriately to supervision, co-workers and usual work

situations, and dealing with changes in a routine work setting.  20 C.F.R. §§

404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it

"significantly limit[s]" the applicant's physical and mental ability to do such basic work

activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

The ALJ concluded that the medical evidence establishes Plaintiff has cerebral

palsy, resulting in functional limitations.  (R. 16, 17, 19).  The ALJ then continued on to

the next step, a finding of whether Plaintiff's condition was severe enough to be set

forth in the Listing of Impairments, Appendix 1, 20 C.F.R. Pt. 404, Subpt. P, Regulation

No. 4.

---

[10] Although the ALJ did not further specify the date Plaintiff's alleges as the onset of his disability, Plaintiff specified on his disability benefits application that he became unable to work as of February 25, 1986.  (R. 99).

**D.**   **Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P.  If the impairments are listed in the Appendix, they are considered severe enough to prevent an individual from performing any gainful activity.  20 C.F.R. §§ 404.1525(a), 416.920(a)(4)(iii) and 416.920(d).  In the instant case, the ALJ determined that although Plaintiff has cerebral palsy, "he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4."  (R. 19).

Plaintiff, in applying for disability benefits, listed as his impairments cerebral palsy, hypertension, "sinus trouble," esophageal spasms, and a non-cancerous brain tumor.  (R. 99, 106).  Because Plaintiff's non-cancerous brain tumor was not diagnosed until January 25, 1999 (R. 145), well after Plaintiff's date last insured, and as there is no evidence in the record that the tumor existed or in any way affected Plaintiff's ability to work prior to December 31, 1999, *i.e.*, Plaintiff's last insured date, the court cannot consider Plaintiff's tumor in determining whether Plaintiff was disabled as of December 31, 1999.  *See Arnone v. Bowen*, 882 F.3d 34, 38 (2d Cir. 1989) (evidence of disability after date last insured failed to establish disability during relevant period of insured status).

With regard to Plaintiff's high blood pressure, a person is disabled under § 4.03 of the Listing of Impairments based on hypertension if the claimant's high blood pressure is accompanied by chronic heart failure as defined under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02, by ischemic heart disease (inadequate blood circulation) as

defined under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04, or under the criteria for a

specifically affected "body symptom," including vision, as defined under 20 C.F.R. Pt.

404, Subpt. P, App. 1, §§ 2.02 - 2.04, renal function, as defined under 20 C.F.R. Pt.

404, Subpt. P, App. 1, § 6.02, or central nervous system, as defined under 20 C.F.R.

Pt. 404, Subpt. P, App., 1§ 11.04A or B.  In Plaintiff's case, there is no evidence in the

record that he was ever diagnosed with either chronic heart failure or ischemic heart

disease, or any problems with his vision, renal function or central nervous system

attributed to hypertension.[11]  Nor is there any indication in the record that Plaintiff's high

blood pressure is not well-controlled with medication, or that Plaintiff experiences any

significant side effects from the medication.  As such, Plaintiff is not disabled based on

hypertension.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.03.

　　　With regard to Plaintiff's "sinus trouble," not only is there no entry in the Listing of

Impairments pertaining to sinus problems, but the record also fails to indicate that

Plaintiff suffers significantly from recurring sinusitis, sinus infections or sinus pressure.

Accordingly, Plaintiff is not disabled by his sinus condition.

　　　Although the record indicates that Plaintiff has recurrent esophageal spasms,

requiring Plaintiff to undergo an esophagus widening procedure every few years, the

record establishes that Plaintiff, as of December 31, 1999, had only one experience

involving his esophagus for which he sought medical treatment, including his November

11, 1988 admission to the Niagara Falls Memorial Medical Center in Niagara Falls, New

---

[11] That there is no evidence connecting Plaintiff's hypertension to any central nervous system problem, as defined under 20 C.F.R. Pt. 404, Subpt. P, App., 1§ 11.04A or B, does not preclude a finding that Plaintiff's cerebral palsy has resulted in a central nervous system problem, as defined under 20 C.F.R. Pt. 404, Subpt. P, App., 1§ 11.04A or B.

York, with complaints of an inability to swallow food.  (R. 181).  The food, however,

passed overnight and a roentgenographic examination performed on Plaintiff at Niagara

Falls Memorial Medical Center on November 27, 1988 was negative.  (R. 182).

Accordingly, the record fails to establish that Plaintiff's esophageal spasms caused him

to be disabled prior to December 31, 1988.

Accordingly, neither Plaintiff's hypertension, esophageal spasms, or "sinus

trouble," either singly or in combination, is so severe as to meet or equal the relevant

Listing of Impairments to be considered disabling.  Nevertheless, the medical evidence

does establish that Plaintiff meets the criteria to be disabled based on cerebral palsy.

According to the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, §

11.07 ("§ 11.07"), disability based on cerebral palsy requires

> *Cerebral palsy*.  With:
> A.  IQ of 70 or less; or
> B.  Abnormal behavior patterns, such as destructiveness or emotional instability;
> or
> C.  Significant interference in communication due to speech, hearing, or visual
> defect; or
> D.  Disorganization of motor function as described in 11.04B.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.07 (italics in original).

Here, Plaintiff contends, Plaintiff's Response at 4, he meets the Listing of Impairments

for cerebral palsy under subparagraph D, which references § 11.04B, which provides:

> *Central nervous system vascular accident*.  With one of the following more than
> 3 months post-vascular accident:
>                       * * *
> B.  Significant and persistent disorganization of motor function in two extremities,
> resulting in sustained disturbance of gross and dexterous movements, or gait
> and station (see 11.00C).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04B (italics in original).

Further, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C states that

> [*p*]*ersistent disorganization of motor function* in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment.  The assessment of impairment <u>depends</u> <u>on</u> <u>the</u> <u>degree</u> <u>of</u> <u>interference</u> with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C (italics in original) (underlining added).

Significantly, on October 24, 1987, Dr. Brennen described the effect of the cerebral palsy on Plaintiff's nervous system as "spasticity of legs - walks [with] bent, spastic legs, slowly and with great effort."  (R. 260).  Plaintiff maintains that this evidence, alone, satisfies the requirements for a finding of disability based on cerebral palsy under § 11.07.  Plaintiff's Response at 4.

The ALJ did not specify why the medical evidence relevant to the period prior to December 31, 1991 did not support a finding that Plaintiff's cerebral palsy is not so severe as to meet the Listing of Impairments' stated requirements to establish disability based on cerebral palsy.  Rather, the ALJ simply states that "while the claimant has cerebral palsy, he has not demonstrated the degree of dysfunction required under section 11.07."  (R. 14).  Nor does the ALJ challenge Dr. Brennen's assessment that Plaintiff has spasticity of his legs, walks with bent, spastic legs, slowly and with great effort.  (R. 260).  Why Dr. Brennen's assessment does not establish that Plaintiff has a "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of . . . gait and station," § 11.04B, as defined under § 11.00C, is not at all clear to the court.  In fact, numerous medical resources use the terms "spasticity" and "paresis" to describe the same or related conditions.  *See e.g.,*

SPASTICITY, *available at* http://www.emedicine.com/neuro/topic706.htm ("Spasticity is usually accompanied by paresis"); JOURNAL OF NEUROLOGY NEUROSURGERY AND PSYCHIATRY, Spastic Movement Disorder: What is the Impact on Clinical Practice?, 2003 vol. 74: 820-21, *available at* http://jnnp/bmjjournals.com/cji/content/full/74/6/820-a (using terms "spasticity" and "paresis" interchangeably); and NEUROLOGY REPORT, Examination and Management of Spasticity and Weakness, by Charles T. Leonard, Sept. 2001, *available at* http://www.findarticles.com/p/articles/mi_qa3959/is_200109/ ai_n8954264 (describing signs of a "spastic condition" as including "muscle paresis").

Here, not only did the ALJ fail to consider whether Dr. Brennen's diagnosis meets the criteria under § 11.07, the ALJ also failed to develop the record on this point if he felt more clarification was needed.  See *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (holding ALJ has an affirmative duty to develop the record).  Moreover, if, in finding that Plaintiff's cerebral palsy failed to meet the requirements of the Listing of Impairments, the ALJ failed to give Dr. Brennen's opinion that Plaintiff has "spasticity of [his] legs," and walks with "bent, spastic legs, slowly and with great effort," (R. 260) controlling weight, the ALJ was then required to provide "good reason" for not granting such opinion controlling weight.  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).

Generally, the Commissioner grants the opinion of a treating physician controlling weight only if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial

evidence in the record, such as the opinions of other medical experts.[12]  20 C.F.R. §

404.1527(d); *Halloran v. Barnhart*, 362 F.3d 28, 31-31 (2d Cir. 2004) (citing *Veino v.*

*Barnhart*, 312 F.3d 578, 588 (2d Cir.2002); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir.

1993)).  Although a treating physician's opinion is to be given controlling weight

provided it is supported by medically acceptable techniques and results from frequent

examinations, *Schisler, supra*, at 567; 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d),

such opinion will not be deemed controlling "[w]hen other substantial evidence in the

record conflicts with the treating physician's opinion."  *Snell, supra*, at 133.  Also, some

determinations, including the ultimate finding of disability, are specifically "reserved to

the Commissioner."  *Snell, supra* (quoting 20 C.F.R. § 404.1527(e)(1).  A treating

physician's statement that a claimant is disabled is, therefore, not determinative by

itself.  *Snell, supra*.

        Nevertheless, the regulations require an explanation of the weight given a

treating physician's opinion and the failure to provide "good reason" for not crediting

such an opinion is a ground for remand.  *Snell, supra* (citing *Schaal, supra*, at 505).

Thus, although the ultimate issue of disability is reserved to the Commissioner, relieving

the Commissioner of having to credit a treating physician's finding of disability, the

administrative decisionmaker is not relieved from the obligation under § 404.1527(d)(2)

and *Schaal*, to explain <u>why</u> a treating physician's opinion is <u>not</u> credited.  *Snell, supra*,

at 134.

---

[12]  Deference is given to the opinions of treating physicians based on the idea that opinions formed as
the result of an ongoing physician-patient relationship are more reliable than opinions based solely on
examination for the purposes of disability proceedings.  *See Schisler, supra*, at 568.

Here, the ALJ failed to comply with this basic requirement.  Significantly, the ALJ does not challenge in any way Dr. Brennen's determination that Plaintiff has a spastic condition in his legs which cause Plaintiff to walk with "bent, spastic legs, slowly and with great effort," (R. 260), and the ALJ also fails to point to any substantial evidence in the record that either conflicts with, discredits or is inconsistent with Dr. Brennen's reported findings regarding Plaintiff's spasticity.  Nor does the ALJ point to anything demonstrating that the spastic condition of Plaintiff's legs, which causes Plaintiff to walk with "bent, spastic legs, slowly and with great effort," (R. 260), does not constitute a "persistent disorganization of motor function in the form of paresis," as defined under § 11.00C and referenced by § 11.04B.

Rather, the ALJ observed that Dr. Brennen indicated on the vocational rehabilitation report that Plaintiff has "some limitations in walking, standing, stooping, kneeling, lifting, and pushing, but the doctor [Dr. Brennen] stated that vocational rehab for some sedentary job would be very beneficial."  (R. 17).  The ALJ continued that "[t]his does not suggest that the claimant's physician considered the claimant totally unable to work."  (R. 17).  Such determination, however, is beside the point, unrebutted by the ALJ, that Dr. Brennen's finding regarding Plaintiff's spastic legs qualifies Plaintiff as disabled based on cerebral palsy as defined by the Listing of Impairments.  Once it is determined that a claimant's medical impairment meets the criteria established by the Listing of Impairments, the inquiry ends.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d) (providing that if there is an impairment and the impairment, or an equivalent, is listed in the Listing of Impairments and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience); 42

U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920

(providing a presumption that an applicant with an impairment as defined in the Listing

of Impairments is unable to perform substantial gainful activity).  *See also Dixon v.*

*Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995) ("If a claimant's condition meets or equals

the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled

to benefits.").  Accordingly, the ALJ required not only that Plaintiff's cerebral palsy meet

the criteria specified under § 11.07 of the Listing of Impairments to be disabled by

cerebral palsy but, also, that Plaintiff's treating physician consider Plaintiff totally

disabled to work, in violation of the relevant regulations.  Such additional criteria for

benefits in this case is therefore manifestly erroneous as a matter of law.  *Gambill v.*

*Bowen*, 823 1009, 1013 (6th Cir. 1987) (holding it was error for Commissioner to

impose additional requirements other than criteria listed for impairment under Listing of

Impairments and citing Graham v. Bowen, 786 F.2d 1113 (11th Cir. 1986)).

Moreover, the Second Circuit recognizes that "the Social Security Act is a

remedial statute which must be 'liberally applied'; its intent is inclusion rather than

exclusion."  *Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990) (quoting *Rivera v.*

*Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983) (further internal quotation omitted).  *See*

*also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) (" The Social Security Act is a

remedial statute, to be broadly construed and liberally applied.") (internal quotation

omitted).  As such, "a claimant need not be an invalid" to qualify as disabled under the

Act.  *Williams*, *supra*.  Nor does the fact that, despite having cerebral palsy, Plaintiff can

walk unaided by assistive devices preclude a determination that Plaintiff's cerebral

palsy is disabling in accordance with the Listing of Impairments.  *See Miller v.*

*Commissioner of Social Security*, 2004 WL 1375545, *5 (E.D. Mich. June 14, 2004) ("That the plaintiff can ambulate (albeit with significant difficulty) without an 'assistive device' does not diminish the requisite degree of severity conveyed by the plain language of the listing."). Accordingly, the medical evidence establishes that Plaintiff is disabled by cerebral palsy as defined under § 11.07 of the Listing of Impairments.

Pursuant to § 205 of the Act, 42 U.S.C. § 405(g), courts may remand cases upon finding the Commissioner "applied erroneous legal standards and arrived at a determination unsupported by substantial evidence." *Aubef v. Schweiker*, 649 F.2d 107, 116 (2d Cir. 1981). "The fourth sentence of § 405(g) authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.'" *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (quoting *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990)); *Raitport v. Callahan*, 183 F.3d 101, 103-04 (2d Cir. 1999). Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, the proper course is a remand to the Commissioner for further proceedings. *Rosa, supra*, at 82-83 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980)). Where, however, there is no apparent basis to conclude that a more complete record might support the Commissioner's decision, a remand limited to calculation of benefits is in order. *Rosa, supra* (citing *Balsamo v. Chater*, 142 F.3d 75, 82 (1998)); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

In the instant case, the ALJ's conclusion that Plaintiff's cerebral palsy is not so severe as to meet the Listing of Impairments stated requirements for disability based on cerebral palsy is not substantially supported by the record. Rather, the record establishes that Plaintiff's cerebral palsy does meet the requirements stated under the

relevant portions of the Listing of Impairments.  Discussion, *supra*, at 26-31.  As such, Defendant's motion for judgment on the pleadings should be DENIED, and the matter should be REMANDED for calculation of benefits.

Alternatively, should the District Judge disagree with the recommendation that Plaintiff meets the Listing of Impairments' stated requirements to be disabled based on cerebral palsy, the court proceeds to the next step, whether Plaintiff retains the residual functional capacity to perform his past relevant work.

**E.     "Residual Functional Capacity" to Perform Past Work**

The fourth inquiry in this five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work.  "Residual functional capacity" is defined as the capability to perform work comparable to the applicant's past substantial gainful activity.  *Cosme, supra*, at *3.

The ALJ found that Plaintiff was unable to perform his past relevant work.  (R. 19).  This finding is undisputed.

**F.     Suitable Alternative Employment in the National Economy**

As the ALJ concluded that Plaintiff was unable to perform his past relevant work, the ALJ went on to make a determination as to whether there was any position within the national economy for which Plaintiff would be qualified or suitable.  Because of the ALJ's finding that Plaintiff's impairments prevented him from returning to his previous work, the burden shifted to the Commissioner to prove that there was substantial gainful work that Plaintiff could perform in light of his physical capabilities, age,

education, experience, and training. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

Further, it is the clear rule in the Second Circuit that "all complaints . . . must be

considered together in determining . . . work capacity." *DeLeon v. Secretary of Health*

*and Human Services*, 734 F.2d 930, 937 (2d Cir. 1984).  It is improper to determine a

claimant's work capacity based solely upon an evaluation of the severity of the

claimant's individual complaints. *Gold v. Secretary of Health and Human Services*, 463

F.2d 38, 42 (2d Cir. 1972).

To make such a determination, the Commissioner must first show that the

applicant's impairment or impairments are such that they permit certain basic work

activities essential for other employment opportunities. *Decker v. Harris*, 647 F.2d 291,

294 (2d Cir. 1981).  Specifically, the Commissioner must demonstrate by substantial

evidence the applicant's "residual functional capacity" with regard to the applicant's

strength and "exertional capabilities." *Decker, supra*, at 294.  An individual's exertional

capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very

heavy" work.[13] *Id.*  In addition, the Commissioner must prove that the claimant's skills

are transferrable to the new employment, if the claimant was employed in a "semi-

skilled" or "skilled" job.[14] *Decker, supra*, at 294.  This element is particularly important

---

[13]  "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §404.1567(a).

[14]  The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled".  *Decker, supra*, at 295.

"Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed.  A

in determining the second prong of the test, whether suitable employment exists in the

national economy.  *Id.* at 296.

In this case, the ALJ determined that although Plaintiff could not return to his

past work as a telephone sales representative (R. 17), Plaintiff retained the residual

functional capacity to perform sedentary work, limited by exertional limitations of lifting

no more than 10 pounds, sitting no more than six hours in an eight hour workday,

standing and walking no more than two hours in an eight hour workday, sitting and

standing without the opportunity to change position at will, no climbing, balancing,

kneeling, crouching or crawling, no more than occasional reaching, fingering or feeling,

or repetitive pushing or pulling with the upper extremities, and pushing or pulling more

than 25 pounds with the lower extremities, and also limited by the nonexertional

limitations of avoiding concentrated exposure to noise, heights, vibration, humidity and

hazards.  (R. 19).  In making the determination, the ALJ also considered Plaintiff's age,

education and that his past relevant work was considered skilled work, but that the

acquired skills are not transferable.  (R. 19).

Upon determining that Plaintiff retained the residual functional capacity to meet

the demands of a limited range of sedentary work, the ALJ then, in accordance with the

second prong of the analysis, applied the Medical Vocational Guidelines ("the grids"), to

---

person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).

"Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties.  Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.  A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. §404.1568(b).

determine whether particular jobs existed in the national economy practical for an individual limited to the applicant's abilities and transferrable skills, *Decker, supra*, at 296, and concluded Plaintiff was not disabled.  Specifically, the grids are often used to determine whether alternative employment exists in the national economy.  *Decker, supra*, at 296; *Bapp v. Bowen, supra*, at 604.  The grids combine several factors including education, work experience, and age to determine whether a finding of "disabled" or "not disabled" should be rendered.

In this case, the grids show that a person such as Plaintiff who, on May 23, 2000, the date of the administrative hearing, was 41 years of age, is classified as a younger individual, with a high school education, whose previous work experience was skilled, but the acquired skills are not transferrable would be found not disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.28.  The ALJ applied Rule 201.27[15] and determined that based on Plaintiff's residual functional capacity for a limited range of sedentary work, his age, education, and work experience, Rule 201.27 of the regulations directed a conclusion that Plaintiff was not disabled.  (R. 19).

However, as the ALJ determined that Plaintiff's "nonexertional limitations significantly diminish his ability to work -- over and above any incapacity caused solely from exertional limitations -- so that he is unable to perform the full range of employment indicated by the [Grids]," the ALJ properly obtained testimony from a vocational expert, Julie Andrews, at the hearing, as to what "jobs exist in the economy

---

[15] Although the ALJ applied Rule 201.27 instead of Rule 201.28, the difference between the two rules is not outcome determinative.  In particular, the sole difference between the two rules is that a person analyzed under Rule 201.28 has previous work experience involving skills, but the acquired skills are not transferrable, whereas a person analyzed under Rule 201. 27 either has unskilled work experience or no work experience.  Application of either Rule 201.27 or 201.28 shows the person is not disabled.

which the claimant can obtain and perform."  *Bapp*, *supra*, at 603.  In the instant case,

Ms. Andrews testified that a person of Plaintiff's age, education and capacity for less

than the full range of sedentary work, based on exertional and nonexertional limitations

as discussed above, Discussion, *supra*, at 33-34, could work as a surveillance system

monitor, for which 191,000 positions exist in the national economy, and 1,250 position

exist in the regional economy.  (R. 51-52).

Plaintiff challenges the ALJ's determination that he could perform the

surveillance system monitor position on the basis that Ms. Andrews also testified that

such position could not be performed if the person took medication that caused

drowsiness which required the person to nap for an hour, two or three times a week,

and also had periodic numbness in his arms and hands.  Plaintiff's Response at 4-5.

According to Plaintiff, because Plaintiff testified that his medication required him to

sleep and as his cerebral palsy caused periodic numbness in his arms and hands, the

ALJ ignored Andrews's testimony that Plainitff could not perform the surveillance

system monitor position.  *Id*.

The ALJ further found that Plaintiff's allegations of limitations are not fully

credible.  (R. 19).  While subjective complaints alone are not sufficient to support a

finding of disability, such complaints must be accorded weight when they are

accompanied by "evidence of an underlying medical condition" and an "objectively

determined medical condition [which is] of a severity which can reasonably be expected

to give rise to the alleged pain."  *Cameron v. Bowen*, 683 F.Supp. 73, 77 n. 4 (S.D.N.Y.

1984).  The ALJ is not, however, required to "accept without question the credibility of

such subjective evidence."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  Rather,

"[t]he ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus, supra*, at 27.

Here, although Plaintiff alleges fatigue as a disabling side effect of his medications, the record establishes that Plaintiff first experienced medication induced drowsiness and fatigue in January 1999, more than eight years after December 31, 1991, the date Plaintiff was last insured for SSDI purposes. (R. 114, 175). Furthermore, the record is devoid of any indication that prior to December 31, 1991, Plaintiff's cerebral palsy caused periodic numbness in his arms and hands. Accordingly, the ALJ did not err in discrediting Plaintiff's subjective complaints with regard to the relevant period of time.

The clinical evidence and medical opinions contained in the record thus, in the alternative, support the ALJ's determination that Plaintiff's impairments do not prevent him from performing a limited range of sedentary work, including the surveillance system monitor position identified by the vocational expert. Accordingly, the ALJ's discrediting of Plaintiff's subjective complaints of pain is supported by the record.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc. No. 14) should be DENIED, and the matter should be REMANDED for calculation of benefits; alternatively, Defendant's motion for judgment on the pleadings (Doc. No. 14) should be GRANTED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     October <u>27</u>, 2005
           Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      October 27, 2005
            Buffalo, New York